## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN BROOKS, and<br>GREGORY SIMMONS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-1334-JES-JEH |
| | ) | |
| CITY OF PEKIN, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |

### <u>ORDER AND OPINION</u>

This matter is before the Court on the Defendants' Motion for Summary Judgment. Doc. 172. The Plaintiffs filed their Response (Doc. 186) in Opposition and supporting Memorandum of Law and supporting exhibits (Doc. 177).[1] The Defendants filed their Reply. Doc. 180. For the reasons set forth below, Defendants' Motion (Doc. 175) is GRANTED IN PART and DENIED IN PART.

### Background

A.  <u>Procedural Background</u>

This case has been extensively litigated for four and a half years. It began on September 14, 2018, when Plaintiffs John Brooks ("Brooks") and Gregory Simmons ("Simmons") filed a seventeen count complaint against the City of Pekin ("the City" or "Pekin") and four Pekin employees: Pekin Chief of Police John Dossey ("Chief Dossey" or "Dossey"), Pekin Deputy Chief of Police Donald Baxter ("Deputy Chief Baxter" or "Baxter"), Pekin Director of Human Resources Sarah Newcomb ("Newcomb"), and Pekin Police Officer Jennifer Melton ("Officer Melton" or "Melton"). Doc. 1. On September 30, 2019, Plaintiffs filed the operative complaint in

---

[1] See the Court's 2/2/23 Text Order for background context.

this proceeding, the Second Amended Complaint.[2] Doc. 37. The Second Amended Complaint contains thirteen (13) counts against the same Defendants.

Counts I-III allege that Brooks is disabled as he suffers from sleep apnea and that City failed to provide a reasonable accommodation (Count I); that he was disciplined and constructive discharged discriminatory because of his disability (Count II) and in retaliation for his requests for accommodations and complaints he filed internally and with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") (Count III).

Count IV alleges that Simmons' discipline and termination were in retaliation because he complained internally of sexual harassment he experienced. Count XII alleges that Brooks was disciplined and constructively discharged in retaliation for exercising his rights under Title VII by filing a retaliation complaint with IDHR and the EEOC.[3]

Counts V, VI, IX, and X allege that Simmons' and Brooks' discipline and termination and constructive discharge, respectively, were the result of unlawful age discrimination. Brooks (Count V) and Simmons (Count VI) charge the City with violating rights under the Age Discrimination in Employment Act ("ADEA"). Brooks (Count IX) and Simmons (X) charge Defendants Dossey, Baxter, and Newcomb with violating the Equal Protection Clause of the Fourteenth Amendment on age discrimination grounds.

---

[2] Confusingly, the Second Amended Complaint (Doc. 30) is the third amended complaint Plaintiffs filed. Plaintiffs filed their first Second Amended Complaint (Doc. 30) on September 11, 2019. Subsequently, Plaintiffs sought leave to amend their complaint to include an additional claim under the Illinois Wage Payment and Collections Act and the Court granted this request. When Plaintiffs chose to file the third amended complaint, they captioned it the Second Amended Complaint (Doc. 37). The court will refer to this document, which is in effect the second Second Amended Complaint, solely as the Second Amended Complaint for the sake of clarity. This also avoids confusion with the Third Amended Complaint (Doc. 95) which Plaintiff were denied leave to file.
[3] This count initially also included the alleged retaliation underpinning Brooks' Title VII retaliation complaint. Doc. 1. That portion of the count was dismissed with prejudice and the claim continues solely based on the post-charge filing retaliation. Doc. 24.

In Count VIII, Simmons alleges a Due Process claim based on Pekin's refusal to pay retiree insurance benefits allegedly owed under a collective bargaining agreement ("CBA").

The Plaintiffs also bring several state law claims. In Count VII, Simmons alleges a state law Intentional Interference With Employment Relations claims against Officer Melton. In Count XI, Simmons brings a state law Breach of Contract claim on the same theory as his due process claim. In Count XIII, Brooks brings a claim under the Illinois Wage Payment and Collections Act ("IWPCA"), alleging that Pekin owes him payment for additional sick days he did or should have accrued.

### B.  Rule 56 and Local Rule 7.1(D)

Before discussing the undisputed facts, the Court addresses Plaintiffs compliance with the rules for summary judgment as set out in Federal Rule of Civil Procedure 56 and Local Rule 7.1(D). These issues began with the filing of the summary judgment briefing in this case. Plaintiffs filed their Response (Doc. 175) to Defendants' Motion for Summary Judgment on November 14, 2022. Plaintiffs' response was extensive and came out to nearly 245 pages. Defendants filed their Reply (Doc. 180) on January 4, 2023. Two days after Defendants filed their Reply, Plaintiffs sought leave to amend to correct roughly 13 citations. *See* Doc. 181. Defendants indicated that they did not object so long as the corrections did not require them to duplicate the extensive effort they'd invested in preparing their responses to Plaintiff's 440+ additional material facts for their Reply. *See* Doc. 182. The Court granted leave for Plaintiffs to file their amended summary judgment motion with the 13 citation corrections. *See* Text Order Dated 1/13/2023.

Instead of filing that amended response, Plaintiffs filed a second motion for leave to file an amended response. Doc. 181. Their motion indicated that in preparing their amended

response, they discovered "significantly more miscites to the record than previously identified" caused by the "utilization of multiple proofreaders some of whom used incorrect or outdated exhibit lists" as well as problems from "internal electronic uploading of text and exhibits." Doc. 181 at 2. They included their proposed amended response, which was six pages longer than their already lengthy prior response, made changes throughout their statement of facts, and included eight new exhibits or portions of exhibits. Plaintiffs offered to reimburse Defendants for the expense of replying to their newly amended response. Defendants objected to this and the Court, acting on its well-settled authority to enforce local rules and manage its docket, denied Plaintiffs motion and allowed them only to file the first amended response they had sought and been granted leave to file. *See* Text Order Dated 2/2/2023.[4] Plaintiffs did so. Doc. 186.

Plaintiffs' noncompliance with local rules and summary judgment pervades their response, even with the corrections they were allowed to make and those they attempted. They spend much of their responses to Defendants Undisputed Material Facts and their Additional Material Facts arguing about whether the investigation and discipline of Brooks and Simmons complied with the Uniform Peace Officers Discipline Act ("UPODA"), 50 ILCS 725/1-1 *et al*, which is of dubious relevance[5] and which they never reference or explain in their actual argument. The Court noted noncompliance in more than 70 of Plaintiffs Additional Material Facts, including citing documents which do not support some or any of the facts Plaintiffs allege, rewriting quotes- sometimes fully inverting their meaning[6], and repeatedly citing to the entirety

---

[4] In particular, this Court took umbrage at the extent to which Plaintiffs' amended response went beyond merely correcting citations and re-wrote or supplemented their brief based on issues identified by the Defendants in their reply.

[5] See n. 21 below.

[6] For example, Plaintiffs counsel asked Baxter at his deposition why he thought Simmons alleged comments on Melton's breasts were worse than what Burris did. Baxter testified that "[w]here I see the difference in the two things is this is sexual harassment directed directly at the female" in clear reference to the Melton comments. In Plaintiffs Material Fact ¶328, Plaintiffs cut out just the "this is sexual harassment" and inaccurately claim that he was referring to Burris's comments to Simmons rather than Simmons comments to Melton.

of lengthy documents or even entire hundred plus page depositions without identifying specific portions that prove or disprove specific facts[7].  Plaintiffs seek to introduce most of their comparator evidence through Brooks' affidavit in the form of inadmissible hearsay without explanation or support as to how Brooks would have personal knowledge of these facts. Of particular concern, given the three Americans with Disabilities Act ("ADA") claims at issue, Plaintiffs repeatedly include statements by Brooks' physician over a period of years which are not found in any of the included exhibits. The only exhibit included from Brook's doctor is a single 2017 report that does not support half of the conclusions Plaintiffs cite it for.

When "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the court may: " (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials including the facts considered undisputed show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). Given Plaintiffs' struggles so far in the summary judgment process, the Court finds that the appropriate remedy is to treat as undisputed those facts that Plaintiffs failed to adequately establish rather than allow them to replead to correct these issues or an alternative remedy.

C.  Factual Background

The Court takes the following facts from the parties' summary judgment briefs and the supporting exhibits. Unless otherwise noted, the following facts are undisputed.

---

[7] See Plaintiff's AMF 212 (citing Doug Vogel's entire 40 page deposition for the fact that Doug met with Baxter and City attorney Herman on June 13); Plaintiff's AMF 253 (citing the entire 31 page transcript of Brook's 6/8/17 interview for the proposition that he gave several reasons why Melton would lie about her charges against Simmons); Plaintiff's AMF 303 (citing Brook's 77 page rebuttal to Newcomb's 40 page report and claiming that his rebuttal corroborated "the majority of his allegations" without identifying any specific allegations and which page(s) in the rebuttal corroborated them).

Plaintiff Gregory Simmons became a police officer in 1991 after serving in the United States Marine Corps. Simmons began working as a Pekin police officer in 1995. Simmons was elected to the police officer's union labor committee in 2005. Simmons was placed on unpaid medical leave between 2006 and 2008.[8] Simmons alleges that his work on the labor committee and the incidents underlying his 2006-08 leave resulted in him having a rocky relationship with Department leadership.

Plaintiff John Brooks became a law enforcement officer in 1990 after serving in the United States Navy. Brooks began working for the Pekin Police Department in 1995 and was promoted to sergeant in 2005 and lieutenant in 2012. Like Simmons, Brooks had a history of service with the officer's union prior to his promotion that put him at odds with the Department's leadership. Brooks suffered from sleep apnea since at least 2003. At that time, Brooks had a few incidents of falling asleep while driving when he worked the Department's third shift.

<u>The Contentious Working Relation Between Simmons and Lieutenant Greg Burris</u>

Prior to October 2015, Simmons started working under Lieutenant Greg Burris ("Burris" or "Lieutenant Burris") on the first shift. Simmons and Burris had an acrimonious and hostile working relationship. Once, Burris threatened to tase Simmons and then did so over Simmons objections.[9] Simmons was elected to the Pension Board in 2014 and Burris was elected to the Board in 2016. Simmons alleges that while they were both on the Pension Board, Burris would ask Simmons to work on pension work while on the clock, including menial work, and would

---

[8] Simmons alleges that he was placed on leave because he refused to accept a promotion in exchange for helping then Chief Gillespie overcome a vote of no confidence. Defendants dispute that this occurred and that it has any relevance.

[9] The Defendants contend that Simmons was wearing a vest and so couldn't be fully tased, but do not appear to dispute that the incident occurred.

disrespect and belittle Simmons. Simmons claims that he had to leave the Pension Board to avoid this treatment.

In October 2015, Burris was ordered by Deputy Chief Kaminski to look into a citizen complaint against Simmons involving a local restaurant, Andy's Diner. The exact details of the complaint and Simmons' underlying conduct is heavily disputed by the parties. Both parties agree that Simmons would frequently eat at Andy's Diner, often with his coworker Officer Richardson and others. In Simmons' retelling, Simmons had a friendly relationship with the Diner's owners and waitstaff and on one occasion a waiter named Cameron brought Simmons a donut with bright pink frosting which "jokingly impl[ied] that Simmons was a homosexual." Plaintiff's AMF ¶30. Simmons told Cameron "[t]hat is funny, just like your pink shirt is funny" and subsequently teased Cameron over his pink shirt. In Defendant's telling, Burris spoke with multiple employees at the Diner who told him that Simmons, in duty and on uniform, had been making comments about the sexuality of multiple teenage employees for at least seven months. Defendant's UMF ¶7. This included once telling the waitstaff that he did not want a homosexual employee to serve him; harassing two male employees, one of whom is homosexual and one not, about being in a relationship; and telling Cameron that he had a "fuck boy haircut." Defendant's UMF ¶69. Simmons either received no discipline or a verbal reprimand as a result of the complaint. *Compare* Defendant's UMF ¶12 *with* Plaintiff's AMF ¶42, 45.

<u>Burris Discusses Simmons' Sex Life At A Shift Briefing And Is Disciplined</u>

Prior to December 2016, Simmons began dating a woman named Ina. AMF ¶67. Burris knew Ina from the community. Ina had minor surgery to cauterize multiple apparent brain aneurysms. While Ina and Simmons were dating, Burris approached Simmons in the squad room and told him that "if you are after Ina's money you had better watch it because I'm going to have

her back. And you had better not fuck her over, and you better not….” At a shift briefing in December 2016, Burris asked Simmons about his relationship with Ina and whether Simmons had sex with her. Burris went on to say that Ina was a wild child and suffered from brain damage. The parties dispute whether Burris's comments were light-hearted and joking or angry and abusive, and whether the atmosphere at the briefing was jovial and laughing or tense and uncomfortable. Simmons complained about these comments to his Sergeant on December 16, 2016. Deputy Chief Baxter spoke with Simmons and Burris about the incident and Burris claimed the comments were joking and in line with other officers' conduct at the briefing. Burris was ultimately disciplined for this incident and was docked two paid personal days 'he had accrued.

Burris and Simmons continued to not get along. Simmons claims that Burris was hostile to him on several occasions in the following months, though none of it was sexual or motivated by Simmons' sex or sexual identity. On April 7, 2017, Burris again asked Simmons questions about his sex life at a shift briefing. Burris asked Simmons if he was “fucking that Iraqi? You know that is Baxter's girl and that could cause some problems.” Deputy Chief Kaminski conducted an investigation into Burris's conduct, including an interrogation of Burris on April 12. Burris denied making the statements, but they were confirmed by several officers who were present. Kaminski was unable to determine Burris's credibility and one of the witnesses was close friends with Simmons, but another was an independent witness whose version of events aligned with Simmons. Chief Dossey and Deputy Chief Kaminski agreed that Burris needed to be disciplined. Burris was given the options of resigning, facing discipline up to and including termination at a hearing of the Police and Fire Commission, or accepting a “Last Chance

Agreement" in which he would be suspended without pay for 21 days and be demoted from Lieutenant all the way down to Patrolman. Burris accepted the 21-day suspension and demotion.

Brooks Becomes First Shift Lieutenant

With Burris's demotion, there was an opening for a first shift Lieutenant. The first shift is from 7:30 AM to 2:30 PM, while the second shift runs from 2:30 PM to 10:30 PM. Brooks preferred to work the first shift to avoid issues with his sleep apnea, though he had worked the second and third shift for many years, including those directly leading up to the case. Brooks was the Lieutenant with the most seniority after Burris's demotion, so he had the option to take over the first shift under the Department's seniority policy.

Brooks became the first shift Lieutenant on May 1, 2017. On that day, Brooks made several comments at shift briefing the exact nature of which the parties dispute, but which included comments on how he felt Burris had mistreated officers while Lieutenant and commenting on union business, though Brooks maintains that this was only because the officers asked him to do so because of his time working with the union. The next day, Brooks again commented on union business and again the parties dispute whether this was at the request of the officers. At that briefing, Brooks also asked Officer Taylor twice if "the drapes match the carpet" in reference to his pubic hair, though Brooks contends that other officers were making similar comments and Officer Taylor had no issue with it. On May 4, Deputy Chief Baxter recommended Brooks receive a written reprimand for making inappropriate comments and commenting on union business. Brooks received a Letter of Reprimand for this conduct on May 9, which he appealed, and which was ultimately upheld as appropriate by the Pekin City Manager.

As first shift Lieutenant, Brooks oversaw Simmons and Officer Jennifer Melton. Brooks and Simmons were good friends, as were Melton and Burris. Brooks alleges that he was told to look out for any retaliation against Simmons because of Burris's demotion. On May 5, 2017, Melton called Simmons a jackass. Brooks learned of the comment and recommended that she be disciplined and receive counseling as a result. Melton received a reprimand that was entered in the department's tracking software and she received counselling for the incident on May 22.

<u>Melton Reports Simmons For Alleged Inappropriate Comments About Her Breasts</u>

On May 24, Melton told Deputy Chief Baxter that Simmons had made inappropriate comments about her breasts in March 2017. Plaintiffs dispute whether Melton stated from the beginning that there were two such incidents, or whether she initially only mentioned a March 25 incident at Steak 'n Shake and only later, in June, claimed that there was an additional incident on March 3. Simmons has consistently denied making any of the comments attributed to him on either occasion.

In the March 3 incident, Simmons allegedly told Melton "Jen I didn't realize that you had such big boobs" in the squad room while Melton's husband Chuck was present. Simmons is also accused of making a hand gesture to indicate the size of her breasts that Chuck Melton observed. The parties dispute whether Chuck Melton's testimony at Simmons' termination hearing and deposition corroborates Officer Melton's account of this incident.

In the March 25 incident, Simmons, Melton, and Officer Richardson were having lunch at Steak 'n Shake when they had a conversation with a civilian named Doug.  During this conversation, Melton claims that Simmons told Doug that she had big boobs under her vest and made a hand gesture describing the size of her breasts. Richardson testified at his deposition that he did not believe that Simmons made any such comment.

On May 26, Baxter ordered Brooks to look into the matter.[10] Brooks asked Simmons and Richardson, who both denied that Simmons made the statements. Brooks asked Melton, who gave her version of the story and told him that Doug was a witness. Brooks relayed this in an email to Baxter on Baxter's request. At this point, Baxter decided to seek out the civilian witness, Doug. The parties dispute Baxter's reason for doing so.[11] Baxter determined that the witness was Doug Vogel, a local man with unspecified mental impairments, and spoke with him. Baxter and Doug had an initial unrecorded conversation and then Baxter took a recorded statement from Doug on the incident. The parties dispute the nature of Baxter and Doug's unrecorded conversation.[12] During the recorded conversation, Doug said that Simmons had commented on Melton's breasts on the date in question and that it made him uncomfortable. Baxter requested that Melton send him an email documenting her version of the event, which she did on May 27.

<u>Simmons Is Interrogated About Melton's Allegations</u>

On June 6, 2017, Simmons received a formal Notice of Interrogation ("June 6 NOI") and was placed on paid administrative leave. The June 6 NOI indicated that it was based on Simmons' "conduct and comments with respect to the physical attributes of a fellow officer" on March 3 and March 25.[13] It included that Simmons was "ordered to refrain from discussing this

---

[10] Plaintiffs maintain that Baxter only told Brooks about the Steak 'n Shake incident, not the March 3 incident, and that Baxter did not tell Brooks that there was a civilian witness or that he should speak to the witness.

[11] Plaintiffs state that he did so because he saw an opportunity to "get back" at Simmons by manipulating Vogel into testifying against Simmons. Defendants claim that Baxter knew that either Simmons or Melton was lying to him as their stories were inherently contradictory, and so he decided to track down an unbiased witness.

[12] Plaintiffs attempt to imply with no evidence that Baxter somehow coerced, pressured or tricked Doug Vogel into believing and stating that Simmons commented on Melton's breasts. Defendants contend that the initial conversation was simply Baxter asking Doug what happened and then asking him if he would consent to being recorded. The only evidence that Plaintiff has for this serious allegation of misconduct is their contention that Vogel gave different and potentially inconsistent versions of his testimony in the ensuing five years, including signing a written statement prepared by Simmons' lawyers where he claimed that he, himself, had made the comments on Melton's breast. This is an insufficient basis to support a reasonable inference that Baxter engaged in the misconduct alleged. It does, however, create a genuine issue of fact as to what Vogel observed and undermines his credibility as a witness.

[13] Plaintiffs maintain that this notice was inadequate under UPODA. Defendant's state that it was adequate as UPODA only requires the information "be sufficient as to reasonably apprise the officer of the nature of the

investigation or the underlying facts with any other officer until the investigation is concluded or you are otherwise authorized to do so." After receiving the June 6 NOI, Simmons called Baxter to ask what it was about. Baxter did not answer his calls. Simmons then called Brooks. The parties dispute whether this was in violation of the notice's requirement that he not discuss the investigation with anyone and whether Simmons knew or reasonably should have known that he should not discuss the investigation even with his supervising officer. In either case, it is undisputed that the Defendants learned of Brooks' and Simmons' conversation prior to Simmons interrogation because Brooks spoke to Baxter on Simmons' request. On June 13, 2017, Simmons received a revised Notice of Interrogation ("June 13 NOI") that included more detail and granted a continuance requested by Simmons' counsel but was otherwise consistent with the June 6 NOI.

Simmons was interrogated about his alleged comments on Officer Melton's breasts on June 19, 2017. Throughout the interrogation Simmons denied ever making comments about Melton's breasts. Prior to the interrogation, Simmons was given a *Garrity* instruction informing him that he had an obligation to tell the truth. During the interrogation, Simmons was also asked whether he had spoken to anyone about the investigation and the parties dispute whether his answers were truthful. Simmons was asked if he reached out to anyone other than Baxter after being placed on paid leave. Simmons initially answered no, but  upon further questioning said "Uh, I reached out to, I never, I tried to reach out to you" and "I reached out to the Chief [Dossey]." He was then asked "Did you talk to anybody else?" and "Not even Lt. Brooks?", and he answered no to both questions. Simmons said that he talked to Lt. Brooks after being on paid leave "but not about this." Later in the interrogation, Simmons was asked if he talked about "the subject of this investigation with any other officer in the department?" to which he answered no.

---

investigation." 50 ILCS 725/3.2. Plaintiff ultimately fails to raise these procedural issues in their argument and thus fail to show why they are evidence of the discrimination and retaliation claims actually at issue in this case.

In their response to Defendant's Undisputed Material Facts and in their Additional Material Facts sections, Plaintiffs argue that it is unclear whether Simmons was referring to the June 6 NOI or the June 13 NOI and whether Simmons believed that the word "officers" in the June 6 and June 13 NOIs only referred to patrolmen not command officers. Plaintiffs also assert that asking what the investigation was about was not discussing the investigation.[14]

During Simmons' June 19 interrogation, his counsel demanded to see a formal sworn complaint. Simmons' counsel took the position that Melton's email was insufficient under UPODA. As a result, the Department called Melton in to sign a formal sworn complaint based on her testimony. Plaintiffs, despite demanding that procedure be followed, suggest that Melton's after-the-fact signing of the sworn statement is evidence of impropriety.

On June 21, Simmons' leave status was changed to unpaid based on the conclusion of the formal investigation. On August 23, 2017, Chief Dossey filed a complaint against Simmons with the Fire and Police Commission regarding his alleged comments about Officer Melton's breasts and his alleged misconduct during the internal investigation.

<u>Simmons Files Charges With IDHR & EEOC</u>

In January 2018, Simmons filed charges with the Illinois Department of Human Rights alleging retaliation because of his complaints against Officer Burris in violation of Title VII. These charges were cross-filed with the EEOC.

<u>The City Learns That Simmons Has Been Secretly Recording Police Meetings</u>

Starting in October 2017, Defendants came to learn that Simmons had been secretly recording police meetings and conversations for nearly a year. The City's risk manager was negotiating a settlement with attorneys for a minor who had been struck by then Pekin Police

---

[14] However, much like their arguments about UPODA violations, Plaintiffs do not raise these arguments properly in the argument section of their brief.

Officer Ujinski ("Ujinski"). During those negotiations, the minor's attorney provided an audio recording in which Chief Dossey referred to the minor as "a piece of shit." The City's risk manager asked Chief Dossey to provide a copy of the recording, and Dossey confirmed that the City was not in possession of any such recording.

This led to an investigation by Deputy Chief Baxter to determine the source of the recording. It was determined that the recording came from a January 11, 2017, shift briefing that Dossey gave on the Ujinski incident and Ujinski's subsequent termination by the Fire and Police Commission. Baxter questioned several officers who denied making the recording and many suspected it may have been Simmons. In conversation with the minor's attorney, the City's risk manager confirmed that the recording came from a male member of the Pekin Police Department and subsequently confirmed that it was Simmons. On August 16, 2017, Simmons filed a complaint against Dossey and Baxter regarding the Ujinski shift briefing. There, he included several direct quotes from Dossey and threatened "to use a different avenue of reporting these incidents" if he did not hear back within a week.

On February 14, 2018, Simmons was served with a Notice of Formal Interrogation regarding the allegations that he'd secretly recorded and leaked the Ujinski shift briefing. In his interrogation, Simmons admitted to recording the shift briefing and sending it to the minor's family and subsequently the minor's attorney. He also admitted that this was not the only meeting he had recorded. He began recording shift briefings and his meetings with department leadership after Burris's comments at the December 2016 shift briefing. He stated that he had to do this to protect himself from retaliation. Simmons said that he had recorded at least 8 briefings or meetings and retained copies of the recordings.

<u>Simmons Is Terminated By The Police and Fire Commission</u>

14

On February 19, 2018, an amended complaint against Simmons was filed with the Pekin Police and Fire Commission that added allegations about the secret recordings. The Fire and Police Commission held an evidentiary hearing on February 21, 2018. Simmons did not appear for the hearing. He claims that he sought to have the disciplinary charges handled through arbitration rather than through the Commission and that he would have waived his right to arbitration if he attended the hearing.

At the hearing, Officer Melton testified about Simmons' comments on March 3 and March 25, 2017. Officer Melton's husband, Chuck Melton, testified that he witnessed the March 3 comments. Doug Vogel testified that he witnessed Simmons make the alleged comments on March 25 and that they made him uncomfortable. Brooks testified that Simmons denied making the comments and that Simmons had talked to him after receiving the June 6 NOI. Baxter testified about the allegations that Simmons lied in his June 19 interrogation when asked about talking to Brooks. Baxter also testified about the extent of Simmons' recordings and that giving the Ujinski recording to the minor's lawyers was a violation of departmental policy.

On March 13, 2018, the Fire and Police Commission issued its findings of fact and decision on the complaint against Simmons. The Commission ordered that Simmons' employment be terminated. As a result of his termination, the City held that Simmons was not a retiree and therefore refused to pay for a portion of his post-retirement insurance as set out in the CBA between the police officers union.

<u>Brooks Is Transferred To Second Shift Due To Melton's Retaliation Concerns</u>

Shortly after making her initial complaint in May-June 2017, Melton told Baxter that she was concerned that Brooks would retaliate against her due to his close friendship with Simmons. Plaintiffs contend that this concern was invalid as Brooks would not have done so. Baxter

recommended he and Melton meet with Pekin HR Director Sarah Newcomb to discuss the issue. Melton stated that she believed Brooks did not like any of the female Pekin officers and that she had previously transferred from third to first shift to get away from Brooks on the third shift.[15] On June 7, 2017, Brooks was told he would likely be temporarily transferred to second shift because of Melton's concerns about retaliation.

On June 8, 2017, Brooks was interviewed over Melton's complaint against Simmons. When questioned why he thought Melton would make up charges against Simmons, Brooks gave a lengthy answer accusing of her of a history of making crude remarks, flirting, and engaging in lewd conduct with other officers, and more. Brooks may have implied in these remarks that Melton had it coming or was a hypocrite for complaining about others' crude remarks given her reputation. Afterwards, Baxter told Brooks that these comments about Melton crossed a line and he should not have said them.

On June 16, 2017, Brooks was told his transfer to second shift was permanent. That same day, Brooks emailed Deputy Chief Baxter stating that his sleep apnea prevented him from working second shift and requesting to be transferred back to first shift as a reasonable accommodation and for reasons of seniority. Baxter denied the request and Brooks forwarded his original email and Baxter's denial to Pekin's City manager.[16] This resulted in Brooks meeting with HR Director Newcomb on June 19 and being given the City's "Reasonable Accommodation Request Form," which he filled out and returned the next day. Brooks' comments on the form

---

[15] Plaintiffs do not dispute the substance of this meeting but note that it differs from how they allege the department treated Simmons' and Brooks' own concerns about retaliation. The Defendants note that Burris was briefly reassigned to second shift while Simmons second complaint against him was investigated to avoid any potential retaliation by Burris against Simmons.

[16] Defendants attempt to characterize this and Brooks' subsequent requests as solely based on seniority, but his email describes his disability and the issues it causes with his work and directly uses the phrase "'reasonable accommodation" and references the ADA. His inclusion of a second reason for the accommodation does not transform what is clearly a reasonable accommodation request into something else.

were a mixture of asking to be placed on first shift because of his seniority and because of his sleep apnea.

On June 26, Brooks filed two complaints against Officer Melton, Deputy Chief Baxter, and Chief Dossey in which he alleged that he was being harassed, discriminated against, and mistreated. One complaint was about his transfer to second shift, and the other involved a situation in which Brooks was accused of improperly encouraging an officer to file a grievance over a labor issue. HR Director Newcomb investigated Brooks' complaints throughout June and July 2017. She interviewed ten witnesses and spent between ten and forty hours on her investigation. At the conclusion, Newcomb decided that Brooks' complaints of harassment, discrimination, and retaliation were unfounded and substantially uncorroborated by other witnesses or evidence. She determined that Brooks' due process complaints failed because as a commanding officer, he was not in the patrolmen's union and therefore had no guaranteed work assignment and could be assigned shifts as needed. She further concluded that it would be unreasonable to move Brooks back to first shift given Melton's fears of retaliation. Brooks claims that Newcomb's investigation was "a farce and could not lead to any credible conclusions" because he feels that she should have talked to him about the issues in his complaint.[17] HR Director Newcomb did not speak to Brooks about the issues in part because she was advised not to by the City's Labor Attorney; and, in part, because she did not feel a need, given the extensive and detailed facts of his complaints and other communications.

---

[17] Brooks also alleges that she should have interviewed nameless unspecified others who were knowledgeable of the incidents. As he fails to provide an adequate basis for who she could have talked to or admissible evidence that there were specific other people knowledgeable about Brooks issues, Brooks has failed to satisfy the requirements of the Local Rule 7.1(D) and Rule 56 and so the Court disregards this unsupported assertion of fact. To the extent he elsewhere claims that Newcomb failed to interview Officers Palmer or Melton, the evidence properly shows that she did so.

During her investigation, Newcomb reported that she found "several incidents of opposing statements to those Lt. Brooks directly associated with people in his narrative." Upon request, several officers executed sworn statements denying making statements that Brooks had attributed to them in his complaints, including Deputy Chief Baxter, Chief Dossey, as well as Sergeant Rick Van Rohr, Lieutenant Jeffrey Little, and Officer Mike Ward. Brooks disputes whether these sworn denials were accurate and maintains that he did not falsely attribute these statements.

<u>Brooks and the City Discuss Accommodations</u>

On July 12, 2017, Brooks attended a meeting to discuss his accommodation request. The parties dispute what was said at this meeting. The Defendants claimed that Brooks denied needing any accommodation and was just asking for his seniority to be respected and to be returned to first shift on that basis. Brooks contends that this was in response to Newcomb asking if he was requesting that they create a new position, and that he maintained that they did not need to do so and could accommodate his disability through his desired shift change. On July 14, 2017, Newcomb informed Brooks that his request was denied, and she believed based on his comments that he was able to complete all job functions without an accommodation.

On October 12, 2017, Brooks and his attorney met again with the City to discuss reasonable accommodations. HR Director Newcomb, Deputy Chief Kaminski, and Joshua Herman, Labor Counsel for the City of Pekin, were present at this meeting. Brooks was asked if he would take the medication prescribed for his condition, which he did not want to do but said he would do if he had to. During the meeting, Herman proposed a number of alternative accommodations that the City would consider for Brooks. These included taking meal breaks whenever needed, taking rest periods during his shift where he could sleep and have the active

18

Sergeants fulfill some of his duties, the ability to nap during his shift, additional five minute breaks, and offering a schedule that would allow Brooks time to adjust to medications. Herman also proposed staggered shifts, but Kaminski and Brooks both agreed that this would be unworkable. Herman maintained that the City might not be okay with allowing all of these accommodations on a permanent basis, but wanted Brooks to have an opportunity to figure out which worked for him and which didn't so they could decide which ones to offer permanently. Brooks was asked to try them and log which ones worked best for him.

After the meeting, Brooks went on vacation for two weeks and next worked on October 28, 2017.

### Brooks Files Failure to Accommodate Charge with IDHR & EEOC

On September 27, 2017, Brooks filed a charge with IDHR and requested it be cross-filed with the EEOC. His September 2017 charge alleged that the City had violated the ADA by failing to provide him a reasonable accommodation for his disability of sleep apnea. This charged was filed with the EEOC and perfected on October 16, 2017. On October 27, 2017, the City was notified of Brooks claim by a letter from IDHR.

### Subordinate Officers' Report Being Pressured by Brooks

On October 26, 2017, Lieutenant Little sent an email to Deputy Chief Baxter about concerns he had heard from two officers. Little stated that Officer Willmert had stopped by Little's office and talked to him about a previous conversation between Willmert and Brooks. Brooks had told Willmert that he "hopes people tell the truth when the time comes" and had asked Willmert to provide him with "written documentation" if needed. Separately, Officer Jones texted Little about Brooks. Jones told Little that Brooks had asked him if Chief Dossey had ever lied to him, and Brooks then told Jones that Deputy Chief Kaminski and Chief Dossey wouldn't

be promoting Jones because of his complaining. Little was concerned that Brooks was putting "undue stress on our personnel at all different levels."

On October 28, 2017, Chief Dossey ordered Deputy Chief Baxter to conduct a formal investigation into the allegations against Brooks. Baxter interviewed several officers who substantially corroborated Lieutenant Little's report. Officer Willmert said that Brooks had said that the City was screwing with him and that he had a lawsuit. According to Willmert, Brooks asked Willmert to write a letter of support for him if needed and said he hoped people would have his back when the time came. Willmert stated that he was concerned about retribution from Brooks if he did not support him. Baxter spoke next with Officer Jones, who confirmed that Brooks asked about Chief Dossey lying to him and that Brooks said he was getting his "ducks in a row." Jones claimed that in their conversation, Brooks told Jones that he had heard from Deputy Chief Kaminski that Chief Dossey accused Jones of whining about not being promoted. When Baxter asked Deputy Chief Kaminski if he had told Brooks any such thing, Kaminski denied it.

Officer Eeten told Baxter that he had a conversation with Brooks in which Brooks told him that Chief Dossey was lying to Eeten and had lied to Brooks on several occasions. Brooks allegedly told Eeten that he might be subpoenaed to testify in Brooks' lawsuit and Eeten reported that these conversations made him uncomfortable because of Brooks' position as a command officer and Eeten's belief that Brooks was very vindictive. Sergeant Van Rohr was the union representative at Officer Eeten's and Officer Jones' meetings with Baxter. At the Eeten meeting, Van Rohr told Baxter that Jones had wanted a union representative present because of concerns that Brooks would retaliate against him. Baxter also investigated the rumor that Brooks was refusing to retire to prevent Jones from being promoted, and learned that Brooks himself was the

source. Brooks told officers in the squad room that he thought the administration was trying to oust him to promote Jones. Sergeant Bush reported to Baxter that Brooks had repeatedly called Chief Dossey, Deputy Chief Baxter, Pekin City Manager Tony Carson, and HR Director Newcomb liars; that he'd made statements at shift brief about how the City was a shitty place to work and other negative comments about the administration.

These comments and conversations all occurred in the period after Newcomb's investigation was completed. Baxter concluded, based on this timing, that Brooks was using his rank and an implied threat of retaliation to pressure subordinate officers into supporting him. As a result, Brooks was placed on paid administrative leave on November 13, 2017, and interrogated on December 15, 2017. At that time, he said he could not remember many of the conversations and statements alleged by his subordinate officers. He did admit to repeatedly telling other officers that Chief Dossey was a liar, and to calling Deputy Chief Baxter and HR Director Newcomb liars. Brooks admitted that he was aware of the City Policy that required Lieutenants not to ridicule rules and regulations, orders, subordinate officers, or superior officers; as well as the policy that Lieutenants were to foster discipline and morale.

Brooks' defense to these allegations is that he believed that everything he said was true. He felt that Chief Dossey had lied to him repeatedly, the City was a shitty place to work, and he was just asking his subordinates to tell the truth, if called. He claims that he would never have retaliated against anyone for not supporting his claims. Much like with the earlier situation with Melton, Brooks does not dispute that the officers genuinely feared retaliation- he only disputes that he would have retaliated given the chance.

<u>Brooks is Accused of Copying Officers' Personnel Records</u>

Following his December 15 interview, Brooks provided supplemental information and statements to the City on January 10, 2018. The 77-page document contained several narratives in response to the allegations against him, and HR Director Newcomb's investigative report. Brooks' rebuttal also included a number of documents, including copies of emails Brooks sent or received, and the disciplinary records and field training files for several Pekin officers. The parties hotly dispute exactly how Brooks obtained these documents and whether his possession of them violated departmental policy and Illinois law. Brooks maintains that it was standard for each lieutenant to maintain a file on officers under their command and that the lieutenants' office also had a Division file which contained copies of discipline reports on subordinate officers. Brooks maintains that he never had any copies of official records that he should not have had and that he never removed any records from the Department.

Defendants contend that Brooks' rebuttal contained several documents that he should not have had access to and that there is evidence that he took important files out of the office either by physically removing them or emailing digital copies to his personal email address. They note that Brooks' rebuttal included a 2007 Letter of Reprimand for Sergeant Von Rohr that states that it will be removed from Van Rohr's personnel file after 18 months; so Brooks could not have included a copy of it unless he or someone else improperly kept a copy at the time. Chief Dossey confirmed that the letter of reprimand had indeed already been removed from Von Rohr's disciplinary file at the time Brooks filed his rebuttal. In his deposition testimony, Brooks admitted that he emailed documents he used to prepare his rebuttal to his personal email to save them. The Defendants accuse Brooks of taking Officer Melton's FTO file out of the department as it was discovered to be missing around this time, though Brooks denies this. Defendants

22

contend that Brooks' actions violated the Pekin Police Department Rule 400.10 and the Illinois Personnel Records Review Act, 820 ILCS 40 *et. seq.*

<u>Brooks Files a Second IDHR/EEOC Charge</u>

On February 13, 2018, Brooks filed a second charge against the City with the IDHR and cross-filed with the EEOC on March 12, 2018. This charge alleged that his transfer to second shift was in retaliation for his interview testimony about Officer Melton during the internal investigation into her complaint against Simmons. Brooks alleged that this was unlawful retaliation for his exercise of his Title VII rights.

<u>Brooks Is Placed On Unpaid Leave And Retires Instead of Facing The Fire and Police Commission</u>

On March 27, 2018, Brooks was placed on unpaid leave status by Chief Dossey. On March 28, 2018, Chief Dossey filed a complaint against Brooks with the Fire and Police Commission. The Complaint alleged that Brooks had intimidated subordinates, submitted untrue statements in complaints to the city, made mutinous and insubordinate comments against the Administration and superior officers, and had taken documents from other officers' disciplinary and personnel records in violation of the Illinois Personnel Record Review Act. On March 28, 2018, the Fire and Police Commission approved Brooks remaining on unpaid leave status pending the outcome of the complaint.

Brooks feared being terminated by the Commission and losing his insurance, as Simmons had. As a result, he authored a letter notifying the City of his retirement. His retirement letter characterized this as an "involuntary retirement" and repeated his accusations of harassment, discrimination, and mistreatment.

<u>Brooks and Simmons File Final Charges with IDHR & EEOC</u>

On January 26, 2018, Simmons filed a charge with IDHR/EEOC alleging violations of the Age Discrimination in Employment Act ("ADEA") and Title VII retaliation. On August 8, 2018, Brooks filed a charge with IDHR/EEOC alleging violations of the ADA, ADEA, and Title VII retaliation.

## Legal Standard

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S., 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).  The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[18]

---

[18]  In their reply brief, Plaintiff's make a great deal of defense counsel's omission of the requirement that the Court at summary judgment draws all reasonable inferences in favor of the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiffs go astray, however, when they insist that on summary judgment that: "Defendants are stuck with Plaintiff's evidence" (Doc. 186, p. 223-24); the Court is stuck with Plaintiff's side of the story (Doc. 186, p. 236); and that the standard is merely "whether there is any evidence at all" to support Plaintiff's version of events (Doc. 186, p. 232).  These statements are simply inaccurate as a matter of law. The Court may

In employment discriminations cases in the Seventh Circuit, factfinders (and courts at summary judgment) should not separate the evidence of discrimination into separate "direct" and "indirect" piles and determine whether either pile in isolation provides sufficient evidence of discrimination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Instead, they must consider all of the evidence as a whole and determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.

Plaintiffs rely largely on the *McDonnell Douglas* framework to argue their termination was motivated by unlawful discrimination or retaliation. This framework requires the plaintiff to show that (1) he is a member of a protected class or engaged in protected conduct; (2) he was meeting the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of that class were treated more favorably. *Marnocha v. St. Vincent. Hospital and Health Care Center, Inc.*, 986 F.3d 711, 718-19 (7th Cir. 2021). If that prima facie case is made, the defendant must provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 719. To rebut this, the plaintiff must show the defendant's provided reason is pretextual. *Id.*

### Discussion

Simmons and Brooks have brought 13 claims alleging that their terminations were discriminatory and retaliatory under various anti-discrimination statutes, along with a federal due process claim and miscellaneous state law claims. At summary judgment, defendants argue that neither Plaintiff can challenge their termination. Even if they can, Defendants argue that there is no evidence that their discipline and terminations were discriminatory or retaliatory and no

---

consider all evidence introduced by the parties and plaintiff is entitled to only reasonable inferences drawn from the evidence presented.

reasonable jury could find so given the extensive and severe misconduct Brooks and Simmons engaged in. They argue that Plaintiffs' due process and state law claims fail as a matter of law. Plaintiffs respond, arguing that they can prove their discrimination claims under *McDonnell Douglas*, and the retaliation claims through suspicious timing and indirect evidence of retaliation, and that their due process and state law claims are viable. The Court will address each issue in turn.

I.      Plaintiffs Ability To Contest Their Terminations

We begin by addressing Defendants' argument that Brooks and Simmons cannot sustain a challenge to their terminations as a matter of law. Defendants argue that Simmons is collaterally estopped from challenging the factual determinations of the Fire and Police Commission because he refused to attend its hearing. Defendants argue that Brooks voluntarily retired and cannot show that he was constructively discharged.

a.      Collateral Estoppel & The Commission's Findings

The Defendants ask this Court to find that Simmons waived the argument that his termination was retaliatory or discriminatory by failing to attend his disciplinary hearing before the Fire and Police Commission. Waiver is "the intentional relinquishment or abandonment of a known right." *Bradley v. Village of Univ. Park, Ill.*, 59 F.4th 887, 895 (7th Cir. 2023). By refusing to attend the hearing, Simmons certainly relinquished some known rights. He relinquished the opportunity to defend himself and present his arguments to the Commission, and the opportunity to seek judicial review of the Commission's decision under the Illinois Administrative Review law, 735 ILCS 5/3-101 *et seq*. However, these are markedly different than the claims before the Court in this case. The court is unpersuaded that his failure to appear waived his right to argue

26

that his termination was retaliatory and/or discriminatory. Waiver is an equitable doctrine and the considerations of fairness do not support adopting an expansive interpretation of it in this case.

The Defendants further argue that Simmons should be collaterally estopped from relitigating the factual findings of the Commission. When a state agency acts in a judicial capacity, federal courts must give the "agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliot*, 478 U.S. 788 (1986). Under Illinois law, "fact issues finally decided in an administrative proceeding that is judicial in nature precludes litigation of those same fact issues in a subsequent proceeding." *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611, 620 (7th Cir. 2006) (quoting *Vill. Of Oak Park v. Ill. Dep't of Employment Sec.*, 772 N.E.2d 951, 953 (Ill. App. 1st Dist. 2002)). Collateral estoppel "applies when: (1) a material fact issue decided in the earlier adjudication is identical to the one in the current proceeding; (2) there was a final judgment on the merits in the earlier adjudication; and (3) the party against whom estoppel is asserted was a party or was in privity with a party in the earlier adjudication." *Id.* Additionally, "the party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *American Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000). Simmons did not appear at the disciplinary hearing and so did not actually litigate any of the factual findings that the Commission made. As a matter of Illinois law, that defeats the Defendant's invocation of collateral estoppel.

For those reasons, the Court finds that Simmons is not barred by waiver or collateral estoppel from arguing that his termination was retaliatory and/or discriminatory and Simmons is not bound by the factual determinations of the Commission.

    b.  <u>Simmons Fails to Establish Cat's Paw Liability</u>

Although he is not collaterally estopped due to the Fire and Police Commission's findings, Simmons must still show that there is a basis for liability for its decision to terminate him. The Fire and Police Commission is an independent body which provides adequate due process protections for officers, *Busche v. Burkee*, 649 F.2d 509, 516 (7th Cir. 1981), and Simmons introduces no evidence of discriminatory or retaliatory animus by the members of the Commission itself.

In order to get around this, Simmons relies on a cat's paw theory of liability.[19] In a cat's paw[20] situation, if the ultimate decisionmaker is by virtue of their role "dependent on another employee to supply the information on which to base the decision", it is appropriate to impute the discriminatory or retaliatory animus of the employee supplying information to the decisionmaker. *Hicks v. Forest Pres. Dist. of Cook County, Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (citing *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007)). To prevail on a cat's paw theory, the plaintiff must show that the discriminatory or retaliatory acts of the non-decisionmaker were a proximate cause of the ultimate employment action. *Id.* (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011)). In other words, that the animus of the police hierarchy so influenced the Commission that this animus may be imputed to the Commission.

Simmons' cat's paw theory fails for several reasons. First, the evidence that the non-decisionmakers, Melton, Baxter, and Dossey had the requisite discriminatory/retaliatory animus is slim. Simmons claims that each of them possessed the requisite discriminatory and retaliatory

---

[19] Defendant objects to Plaintiffs cat's paw theory on the grounds that Plaintiffs raised it for the first time on summary judgment. However, it is well-settled that complaints state causes of action, not legal theories. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a "complaint need not plead legal theories").

[20] The Supreme Court has explained the origin of the term cat's paw as follows: "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n. 1 (2011) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990)) (internal citations suppressed).

animus. At the outset, the Court notes that Plaintiffs repeatedly says in their arguments at summary judgment only that these actors had animus, not discriminatory or retaliatory animus. It is insufficient to merely show that these actors possessed a general dislike or animus against Brooks or Simmons, it must be shown that they had a discriminatory or retaliatory animus against them. While this could be the result of mere brevity, the substance of Plaintiffs arguments regarding animus makes the court wonder. In their section on individual liability, they argue that Melton had animus against Brooks because he "dared to hold [her] accountable when she made a mistake" and therefore she "made up a lie that Brooks was retaliating against her." Similarly, they argue that Melton had animus against Simmons based on the fact that Simmons reported her for calling him a jackass, after which she made up a lie about him. If this is Plaintiffs' case, that the people responsible didn't like Simmons and Brooks because of conduct unrelated to their protected activity, age, or disability, then they fail utterly to sufficiently allege that they were the victims of unlawful discrimination and retaliation in these instances.

Nevertheless, the Court does its best to construct the argument for the Plaintiffs that Melton, Baxter, and Dossey were motivated by discriminatory and retaliatory animus. Simmons' ironclad conviction that Melton was retaliating against him is based on little else than the fact that she was friends with Burris and that, according to him, Simmons and Melton got along well prior to his complaints against Burris. This combined with his denial of inappropriately commenting on her breasts is all the evidence he has that her actions were retaliation for his complaints about Burris.

As to Baxter, the sole evidence of his retaliatory animus is his alleged friendship with Burris and that he chose to investigate the accuracy of Melton's story by tracking down the witness to Simmons' alleged March 25 comments. Despite Plaintiffs best efforts to drape that

decision in impropriety, there seems to be nothing wrong with a commanding officer finding and interviewing an independent witness when two of his officers were telling him irreconcilable versions of the same story (Melton insisting that Simmons commented on her breasts and Simmons denying it).

As to the claims of discriminatory animus by Dossey, Plaintiffs rely on a conversation Brooks claims to have had with Dossey who said things had changed because of Simmons' complaint and that officers were no longer at liberty to joke around anymore. This conversation allegedly happened after Brooks disciplined Melton for calling Simmons a jackass. Dossey's comments at least relate to Simmons complaint and show some possible discomfort with or frustration at Simmons.

This evidence is far too thin to allow the reasonable inference that Melton, Baxter, and Dossey were retaliating against Simmons. It is considerably weaker than the evidence of animus in any of the cases identified by Plaintiffs. *See Hicks*, 677 F.3d at 787 (supervisor overseeing plaintiffs told intermediate supervisor that plaintiffs "'needed to be fired' because they had filed charges of discrimination against [supervisor]" and two other management-level employees told intermediate supervisor to "get rid of" plaintiffs.); *Staub*, 562 U.S. at 414 (evidence of supervisor's animus against plaintiff's military service consisted of statements that he would "pay back the department for everyone else having to bend over backwards to cover his schedule for the Reserves" and that his "military duty had been a strain on the department" and therefore asked another supervisor to "get rid of him.")(cleaned up).

Simmons' evidence of animus fares even worse on his age discrimination claims. He introduces no evidence that Melton or Baxter had any issue with his age or that Melton's complaint was in any way motivated by his age. Even assuming that the indirect comparator

30

evidence can be attributed to Chief Dossey, none of the comparators are sufficient for the reasons discussed below. The insufficient evidence of discriminatory or retaliatory animus is fatal to Simmons' case as he has no other basis to impute discrimination and retaliation to the ultimate decision-maker, the Commission.

Even if Dossey's comments or Burris's friendship with Melton and Baxter was sufficient evidence that their actions were motivated by retaliatory animus, the causal connection between Melton's complaint and Simmons' ultimate termination is so attenuated that it cannot be the proximate cause of his termination. Melton would have had to know that Baxter and Dossey would take her side when Simmons denied her accusation; that Doug Vogel would share her version of events; that Officer Richardson, the other alleged witness, would not be contacted or that his denial would not be credited; that HR Director Newcomb would agree with her after conducting an independent investigation; and that ultimately, the Fire and Police Commission would find her version of events more credible than Simmons. This chain seems far too attenuated for proximate cause purposes.

Accordingly, we find that Simmons has failed to show that his termination was retaliatory or discriminatory under a cat's paw theory of liability and to the extent that his claims rely thereon, Defendant's motion for summary judgment is granted.

        c.   <u>Brooks' Constructive Discharge</u>

Unlike Simmons, Brooks chose to retire rather than face termination. This defeats his discrimination and retaliation claims to the extent they rely on his termination unless he can show that his decision to retire was a constructive discharge. The Seventh Circuit recognizes at least two forms of constructive discharge that could apply to Brooks. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). "In the first form, an employee resigns due to

alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) and *Boumedhi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007)). The second form occurs "when an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated." *Id.* (quoting *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002)). Both forms of constructive discharge require showing that working conditions were objectively intolerable. *Id.*

Defendants argue that Brooks cannot establish that he was constructively discharged because his termination was ultimately up to the Fire and Police Commission. They direct us to *Palka v. Shelton*, 623 F.3d 447 (7th Cir. 2010), where the Seventh Circuit held that an officer who resigned rather than face a disciplinary hearing was not constructively discharged. The Seventh Circuit stated that the hearing included adequate due process protections and therefore the employee's decision to "resign rather than risk an unfavorable Merit Board decision does not make his resignation involuntary." *Id.*; *see also Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 859 (7th Cir. 2010); *Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005). Like the Merit Board, the Fire and Police Commission that would otherwise have heard the charges against Brooks, affords officers facing disciplinary charges adequate due process protections. *See Ulrey v. Reichart*, 941 F.3d 255, 262 n. 2 (7th Cir. 2019). If Brooks believed himself innocent of the disciplinary charges levied against him, he could have contested them before the Fire and Police Commission.

Plaintiffs argue that Brooks' case is distinguishable because he was on unpaid leave at the time he resigned, unlike the plaintiff in *Palka*. Failing that, Brooks argues that a jury could find his working conditions so unbearable that he was constructively discharged. Plaintiff's argument on this point consists almost entirely of claims that he himself made in his retirement letter. Brooks repeats that in his retirement letter he alleged "continued and deliberate 'harassment, retaliation, discrimination, threats, denial of accommodations, abuses of process, denial of access to employment processes, unfair alterations to work conditions, unfair alterations of work hours, disproportionate penalties, ignoring of complaints, and suspension without pay." They note that he alleged in his letter that these issues were repeated over time and said that they were severe. Plaintiffs' decision to base the core of their argument on statements Brooks made in his retirement letter, rather than actual evidence showing the truth of those statements, is questionable. At the summary judgment stage, the parties can neither rest on their pleadings nor create a genuine issue of fact by mere assertion. Brooks' statements in his retirement letter are at best evidence of his subjective state of mind or that the Defendants were on notice, neither of which are at issue here. Crucially, for constructive discharge, the issue is whether a reasonable employee in Brooks shoes, not Brooks himself, would have felt that the working conditions so unbearable that he had to quit.

Brooks has failed to produce sufficient evidence, even viewing it in the light most favorable to him and drawing all reasonable inferences in his favor, that his working conditions were so intolerable that a reasonable person in his position would be forced to quit. This standard is more exacting than an ordinary hostile work environment claim, which requires severe and pervasive discrimination. Brooks had been assigned to work a shift that created problems with his sleep apnea but which he had worked for years. While Plaintiffs' counsel claims that the job

was "literally killing him," this is not backed up by the evidence. He has introduced no evidence showing that he was facing serious medical problems during the months after his transfer back to the second shift and the only doctor's note in evidence does not support such bold claims. During the October 12, 2017, accommodations meeting, Brooks appeared ambivalent about taking medication for the condition he now claims was killing him. His additional claims that he faced termination, was suspended without pay, and, like Simmons, could have lost his retirement insurance coverage are not enough.

Accordingly, we find that Plaintiffs have failed to create a genuine issue of fact as to whether Brooks was constructively discharged. To the extent Brooks' claims depend on him being terminated, the Defendant's motion for summary judgment is granted.

    II.    <u>Plaintiffs Comparator Evidence for their Discrimination and Retaliation Claims</u>

We now consider Plaintiffs' compactor evidence relied on for each of their discrimination and retaliation claims, many of which are supported by no other evidence of discrimination or retaliation. Plaintiffs seek to prove that their discipline and termination were discriminatory and retaliatory by evidence of eight officers who, they allege, were not members of Plaintiffs' protected classes (age, disability, and protected activity), and who had engaged in similar misconduct and were treated more favorably.

In employment discrimination cases, a plaintiff may introduce evidence of similarly situated employees who were not members of their protected class and were treated more favorably to prove that their treatment was motivated by discriminatory animus. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (Title VII claims); *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 720 (7th Cir. 2021) (ADEA claims); *Tyler v. Ispat Inland*

*Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (ADA claims); *Reinebold v. Bruce*, 18 F.4th 922, 926 (7th Cir. 2021) (§1983 Equal Protection claims).

Similarly situated employees "must be directly comparable to the plaintiff[s] in all material respects, but they need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846. Whether a comparator is similarly situated is "usually a question for the fact-finder" and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). In the "usual case a plaintiff must show at least that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and 3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847.

In disparate discipline cases, the "similarly-situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline." *Id.* at 850. This requirement can be satisfied by comparators whose misconduct was different but who were charged with violating the same rule or policy. *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). In determining whether two employees "have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Id.*

The alleged misconduct that led to Simmons' discipline and termination included him allegedly making two inappropriate comments about a female coworker's breasts, harassing waitstaff at a local diner, lying during an investigation about violating a *Garrity* order, and covertly taping a confidential police briefing and then giving the recording to the subject of the briefing and his lawyer. Brooks' alleged misconduct includes improperly copying personnel files,

making inappropriate comments about union business, filing internal complaints with falsified details, and undermining morale by repeatedly telling subordinates that the department's leaders were liars and couldn't be trusted.[21] Based on the admissible evidence introduced by Plaintiffs in their response to Defendant's motion for summary judgment, none of the eight officers committed comparably severe misconduct and so none is a suitable comparator. Additionally, it is undisputed that as a lieutenant, Brooks was subject to a higher standard. Of the eight comparators, only Burris was a lieutenant and therefore the other seven fail as comparators for Brooks as they were not subject to the same standards.[22] The Court addresses each individual officer in turn.

    a.   Officers Thompson and Ward and Sergeant Barth

---

[21] The Court notes that for each type of misconduct alleged, the Plaintiffs either dispute ' engaging in the alleged conduct (such as Simmons denial of commenting on Officer Melton's breasts or Brooks fabricating officers statements for his internal complaints) or admit doing so but dispute their impropriety (such as Simmons' claim that recording shift briefings and leaking them was not illegal or Brooks' claim that it was not unlawful to procure and publish the disciplinary records of others ). Plaintiffs have done everything they can to make this case about whether Simmons and Brooks were terminated for adequate cause and whether the Defendants complied with procedural requirements such as the Uniform Peace Officers Disciplinary Act ("UPODA"), 50 ILCS 725/1-1 *et al*, rather than the legal issues actually raised by their claims- whether Defendants actions were caused by unlawful discrimination and/or retaliation. These invocations frequently muddy the issues. To the extent that Plaintiffs seek to use these disputed procedural irregularities as evidence of discrimination or retaliation, they fail because Plaintiffs fail to make an adequate showing that Defendants complied with UPODA for officers who were younger/non-disabled/etc. or that their non-compliance in Brooks/Simmons were due to unlawful animus.

Plaintiffs seem to argue that their alleged misconduct should not be considered when comparing the discipline they faced with that of other employees at summary judgment. The Court finds this argument confusing and unpersuasive. The treatment of similarly situated employees is relevant because it helps the trier of fact determine whether the plaintiffs would have been treated the same but for their protected class. The factual question at issue is whether the Defendants would have disciplined Brooks and Simmons as harshly if they were younger, not disabled, or had not engaged in protected activity (depending on the specific claim). For purposes of comparators, then, the Court thinks it appropriate to consider the alleged misconduct.

The questions of whether Simmons and Brooks actually committed the alleged misconduct fits much more naturally into the issue of pretext. *See Curry v. Menard, Inc.*, 270 F.3d 473, 479-80 (7th Cir. 2001) (where black employee claimed she was disciplined more harshly than non-black coworkers, validity of discipline went to pretext).
[22] But see *Coleman*, 667 F.3d at 849-50 ("proposed comparator's position or rank may be important, but only *'provided that the employer took these factors into account* when making the personnel decision in question.") (quoting *Eaton v. Indiana Dep't. of Corrections*, 657 F.3d 551, 559 (7th Cir. 2011) (emphasis in original)).

Plaintiff's attempt to introduce key details of the alleged misconduct and discipline of Officer Thompson, Officer Ward, and Sergeant Barth through Brooks' affidavit. An affidavit "used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory" do not meet this requirement. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). "Generally, a witness may only testify concerning matters about which that witness has personal knowledge and only if there is sufficient evidence to support the witness's personal knowledge as to that matter." *Sizelove v. Madison-Grant United Sch. Corp.*, 59 F. Supp. 3d 1246, 1263 (S.D. Ind. 2022) (citing Fed. R. Evid. 602). The evidence for several comparators fails to meet this requirement.

The key allegations against Officers Thompson and Ward are not presented in an admissible form. For Officer Thompson, Plaintiffs cite to a Letter of Reprimand and Brooks' affidavit. The Letter of Reprimand states that a Pekin citizen complained about text messages between Officer Thompson and the citizen's estranged wife. Doc. 177-139, Plaintiff's Exhibit 138. It notes that these text messages could reflect poorly on the department and that several of them were sent while he was on duty but offers no further details. *Id.* Plaintiffs attempt to introduce salacious details about the contents of those text messages through Brooks' affidavit. Doc. 186 at 206, Plaintiff's AMF ¶340-342 (claiming that the texts included a statement that Officer Thompson could not get an erection without cocaine as well as photos of himself in uniform with his genitals exposed). The only basis for Brooks personal knowledge of this is that

a different officer, Sergeant Van Rohr, saw them and told Brooks about it. *Id.* This is an inadequate basis to establish Brooks personal knowledge of this fact.

The same issues arise with Plaintiff's evidence for comparator Officer Ward. Brooks' affidavit alleges that Officer Ward used the law enforcement database LEADS to keep tabs on his ex-wife. Brooks claims that Chief Dossey and Deputy Chief Baxter stated Ward could not be disciplined because he was off the clock. Brooks alleges in his affidavit that this is not consistent, with Officers Ray Besimi and Adrian Gonzales, who were apparently suspended for off duty conduct. No foundation is given for how Brooks knows any of this, how he would be competent to testify to these matters, or even sufficient details about the two additional officers to meaningfully compare them.

The same issue underlies two of the three incidents of alleged misconduct by Sergeant Barth. Brooks alleges that Barth pressured a Tazewell County deputy to fraudulently list another Pekin officer as not at-fault in a traffic incident but was not disciplined for this after it was reported to the Chiefs. Brooks' affidavit fails to include sufficient evidence to explain how he has personal knowledge of the details of this incident. Brooks alleges via affidavit that Sergeant Barth took a sniper rifle from the Department's armory to his home, and it was returned after Deputy Chief Kaminski ordered an investigation.[23] Only one incident involving Sergeant Barth is supported by admissible evidence beyond the Brooks affidavit. In that incident, Sergeant Barth made a friendly wager with another officer about the results of the 2015 sergeant's promotional process. The wager was for a single Mountain Dew, and Barth received a 1-day unpaid

---

[23] Plaintiffs allege that Barth in fact attempted to steal the sniper rifle and hoped that no one in the department would notice. Like their other allegations, this allegation in Brooks affidavit is merely his speculation or conjecture with no basis for his personal knowledge of Sergeant Barth's motive. The basis for Brooks knowledge in the affidavit is only that he was range master at the time and informed Kaminski of it. As such, the above reflects only the admissible allegations in Brooks' affidavit as to this incident.

suspension as discipline. To the extent that Sergeant Barth was disciplined for the bet as a violation of the policy requiring commanding officers to foster morale, his conduct is much less serious than the repeated behavior of Brooks. In summation, the first incident is wholly inadmissible as presented, the most serious details of the second incident are inadmissible as presented, and the third is not comparably serious.

No reasonable jury could find, even drawing all reasonable influences in Plaintiffs favor, that Thompson's, Ward's, or Barth's misconduct were comparably serious to that of Simmons and Brooks.

### b.  Lieutenant Burris

Lieutenant Burris is the closest to a valid comparator that the Plaintiffs identify , but even this comparison falls short. Burris was disciplined for making inappropriate comments about Simmons' sex life in December 2016 and April 2017. In response, he was temporarily transferred to second shift while Simmons' complaint was investigated, and on conclusion of the investigation, docked two days of paid leave for the first offence. For the second instance, he was given the options of resigning, facing disciplinary charges at the Fire and Police Commission up to and including termination, or accepting a Last Chance Agreement in which he would be suspended for 21 days and demoted all the way from Lieutenant to Patrolman. Burris accepted the Last Chance Agreement.

Burris's misconduct is similar to the accusations regarding Simmons' alleged comments about  Officer Melton's breasts. Their conduct was in violation of the same departmental rules and policies and was similarly serious. It may be arguable whether Burris's discipline was more lenient than Simmons', especially given his significant demotion for the second offence. Burris escaped termination by accepting a Last Chance Agreement. Defendants claim that they tried to

negotiate a Last Chance Agreement with Simmons, but his counsel refused or failed to do so. If this was the sole basis for Simmons termination, the validity of this comparison would be an issue the jury to resolve. But that is not the case. Burris's conduct is not similar or similarly serious to Simmons recording internal police meetings and disclosing at least one confidential recording to lawyers for an adverse party, in violation of departmental policy. Accordingly, Burris is not a valid comparator for Simmons.

Burris was a Lieutenant, like Brooks, but his misconduct was substantially different and less serious than what Brooks was accused of. The accusation that Brooks was spreading insubordination, improperly copying and removing disciplinary and personnel records, and pressuring subordinates into supporting his case against the Administration are more serious than Burris's inappropriate comments about Simmons' sex life. They are also violations of different rules and policies. As such, Burris is not a valid comparator for Brooks.

### c.  Officer Melton

Officer Melton fails as a comparator because her misconduct is considerably less severe than what Brooks and Simmons were accused of. Officer Melton used her cellphone while driving her squad car and denied doing so when asked during an investigation. Even drawing all reasonable inferences in Plaintiffs favor, no reasonable jury could find that talking on a cell phone while driving was similarly serious as the misconduct Simmons and Brooks are alleged to have committed.

### d.  Officers Willmert and Gallup

The final pair of comparators are Officers Willmert and Gallup. The alleged misconduct by both officers arises from incidents involving B.R., a female minor who volunteered with the department. While speaking casually with B.R. one day, she was showing Officer Willmert

things on her phone when he asked her to show him "the bad stuff" on her phone. When she showed him the photo gallery on her phone, he saw nude pictures of B.R. included amongst her photos. He questioned her about them and learned that she had sent them to Officer Gallup and possibly other officers of the Pekin Police Department and another local police department. Officer Willmert reported this to Officer Melton and his superior officers, who ordered an investigation into the matter. Upon confirming the likely accuracy of the minor's story, the matter was referred to the Illinois State Police for an external investigation. The ISP investigation indicated that Officer Gallup had improperly solicited nude pictures from the minor but exonerated Officer Willmert of any misconduct. Officer Gallup was placed on unpaid suspension and Chief Dossey sought to have him terminated by the Fire and Police Commission, but he retired before that could happen.

Officer Willmert is not a suitable comparator because it is undisputed that he was exonerated of any misconduct. As for Officer Gallup, he is not a suitable comparator because he, retired before any final discipline could be determined by the Fire and Police Commission. Plaintiffs fail to articulate how this is more lenient discipline than what Simmons and Brooks faced. Accordingly, Officers Willmert and Gallup are not suitable comparators.

III.    Plaintiffs Discrimination and Retaliation Claims

With these general matters addressed, we turn to the merits of Plaintiffs individual discrimination and retaliation claims.

a.    Brooks ADA Claims (Counts I-III)

Brooks brings three claims under the Americans with Disabilities Act, 42 U.S.C. §12111 *et seq*. He claims that Defendants failed to reasonably accommodate his sleep apnea,

discriminated against him due to his disability, and retaliated against him for requesting reasonable accommodations.

### i.  Count I- Brooks' Failure to Accommodate Claim

To prove a failure to accommodate, Brooks must show that (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). "Reasonable accommodation" means modification to the work environment or the manner in which the position is performed to enable a qualified individual with a disability to perform the essential functions of the position. *Id.* (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). A reasonable accommodation may include a modified work schedule. 29 C.F.R. § 1630.2(o)(2)(ii). The parties do not dispute that Brooks was disabled due to his sleep apnea and that the Defendants were aware of that issue. The claim therefore focuses on whether Brooks was a qualified individual and whether the City of Pekin failed to reasonably accommodate his sleep apnea. As the Court finds that Brooks has failed to show a genuine issue of material fact to support that the City did not offer him reasonable accommodation, we need not address whether he was qualified in light of his alleged misconduct.

The Defendants argue that the only accommodation Brooks was interested in, a transfer back to the first shift, was unreasonable and an undue hardship. Brooks was transferred to second shift due to the concerns of Officer Melton and others that Brooks would retaliate against them. The City argues that it would need to move those officers to different shifts in order to put Brooks back on the first shift, and that it could not do so under the CBA which limits the City's ability to switch officers' shifts. Brooks argues that there was no evidence that he ever retaliated against Melton and therefore the City should not have transferred him off of first shift on those

grounds. He argues that the only reasonable accommodation was to place him back on the first shift. He insists that none of the City's proposed accommodations would work for him and that as the lieutenant with the most seniority he was entitled to be on first shift.

Brooks' claim ultimately fails because he was offered multiple alternative accommodations and refused all of them. Whether this was because he was never actually interested in an accommodation, as the City claims, or because he sincerely believed that no other accommodation would work is ultimately irrelevant. On October 12, 2017, Brooks and his attorney met with HR Director Newcomb, Deputy Chief Kaminski, and Joshua Herman ("Herman"), Labor Counsel for the City. At this meeting, the City proposed multiple alternative accommodations. The City discussed the possibility of Brooks taking the medication he had been prescribed for his condition, something he initially refused. He was offered rest periods during his shifts, the ability to sleep during his shifts, and a work schedule that would allow him to adjust to his medication. The City offered to let him try any or all of these options and determine which, if any, worked for him.

Crucially, several of these accommodations are the same as those suggested by Brooks' doctor. *See* Doc. 177-52, Plaintiff's Exhibit 50 (Brooks' doctors note suggesting that he take melatonin and take brief naps during work breaks). Brooks acknowledged in the meeting that if he needed to take medication he would do so. Brooks argument in rebuttal that these were not the accommodations he wanted is unavailing. The City engaged in the interactive process and identified several potential reasonable accommodations which it could offer Brooks. This satisfied the City's obligations under the ADA. Brooks provides no evidence that he could not work second shift under any combination of the City's proposed accommodations other than his own assertion. The question then is whether a plaintiff can create a genuine issue of material fact

43

as to the reasonableness of accommodations solely by saying that he did not think they would work, especially when those accommodations are consistent with his doctor's recommendations? The only answer to that question can be no.

Even if Brooks could show that the only reasonable accommodation was a return to first shift, he runs into a second pitfall. After the October 12 meeting to discuss accommodations, Brooks went on vacation. When he returned from vacation, he was placed on paid leave within a few weeks. He was on paid leave till March 27, 2018, when Dossey placed him on unpaid leave. He remained on unpaid leave until he retired in July 2018. There was never an opportunity for him to be reasonably accommodated. While this suspicious timing is significant for his ADA retaliation claim, it is fatal to his ADA reasonable accommodation claim.

No reasonable jury could find that the only reasonable accommodation was returning Brooks to the day shift. Even if were, there was no opportunity for the proposed accommodations to be implemented as Brooks was almost immediately suspended. Accordingly, Defendants motion for summary judgment is granted as to Count I.

### ii.  Count II- Brooks' ADA Disparate Treatment Claim

Plaintiffs have failed to show that there is a genuine issue of material fact as to whether Brooks' discharge was motivated by his disability. Brooks seeks to prove his ADA Disparate Treatment claim under the indirect, burden shifting method. As discussed above, the Court has found that Brooks cannot show that he was constructively discharged and there are no similarly situated comparators to Brooks.  This is fatal to his claim as the comparators are the sole evidence for causation.

Brooks seems to argue that he can satisfy the similarly situated prong on this claim, not through the previously identified comparators, but because the Department deviated from (what

he alleges) is its standard practice of letting lieutenants choose their shifts based on seniority. He argues that this shows that similarly situated non-disabled employees were treated more favorably.

The issue with this argument is that it views the elements of the *McDonnell-Douglas* test in isolation rather than as a cohesive whole. Similarly situated comparators are useful because they help the trier of fact isolate the discriminatory variable (in this case Brooks disability) as they try to answer the fundamental question in every discrimination case: if the plaintiff had not been disabled, would he have suffered the adverse employment action? For that reason, it's crucial that there be an adequate overlap between the adverse employment action at issue and the similarly situated comparators. Brooks argument would at most show that if not for his sleep apnea, he would have remained on the first shift. He fails to show that if not for his sleep apnea, he would not have been disciplined, put on unpaid leave, or faced termination and the loss of his insurance benefits, forcing him to retire. If the shift change is all that is attributable to his disability, then his claim fails as a matter of law as a shift change alone is not an adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012).

While *Porter* seems to indicate that it could be an actionable if intended to exploit a known vulnerability, the only cases applying this theory arose under retaliation claims which are subject to a broader standard of actionable adverse actions. *Id.* (discussing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) but refusing to extend its holding to discrimination claim at issue). Decision of this court and others in the Seventh Circuit have not extended the known vulnerability theory to discrimination claims. *See Staub v. Hy-Vee, Inc.*, No. 19-4249, 2022 WL 826930 (C.D. Ill. 2022); *Douhit v. TC Heartland LLC*, 2014 WL 1584320 (S.D. Ind. 2014). We are not persuaded to do so in this case.

Accordingly, Defendant's motion for summary judgment is granted as to Count II.

### iii.  Count III- Brooks' ADA Retaliation Claim

Finally, while Brooks can make out a prima facie case of retaliation, he has no evidence that Defendants reason for disciplining him was pretextual. The prima facie case for a retaliation claim requires a plaintiff to prove "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two." *Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). A plaintiff may prove a causal connection between his protected activity and adverse treatment through "suspicious timing, ambiguous statements oral or written, [] and other bits of evidence from which an inference of retaliatory intent might be drawn." *Coleman*, 667 F.3d at 860. As a general rule, "temporal proximity between an employee's protected activity and an adverse action is rarely sufficient to show that the former caused the latter." *Id.* (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)).

The precise timing of Brooks protected activity and adverse treatment is as follows. Brooks first requested remaining on first shift in June 2017 as an accommodation. The City either denied that request or interpreted it as a request based on the seniority policy rather than as a request for accommodations and so denied it. On September 28, 2017, Brooks again requested an accommodation to be taken off of second shift. Brooks met with representatives from the City on October 12, 2017, to discuss reasonable accommodations for his sleep apnea. After that meeting, he went on vacation until October 28th. On October 27th, the City received notice of Brooks' ADA claim that he cross-filed with the Illinois Department of Human Resources and the

Equal Employment Opportunity Commission. Neither party introduces evidence showing when the letter was received by the City or when Dossey was informed of its contents.[24]

Lieutenant Little emailed Deputy Chief Baxter on October 26, 2017, at 9:37 PM about Brooks improper conversations with subordinates. Dossey was informed of this either that night or the following morning and he emailed his assistant at 8:55 AM on the 27th to ask her to begin put together the paperwork for a formal investigation. Deputy Chief Baxter was ordered to begin his investigation on October 30, 2017. Brooks was placed on paid leave on November 13, 2017, as a result of the investigation. This became unpaid leave in March 2017 and he retired in July.

Viewing the timing in the light most favorable to Brooks, as we must do, the City received notice of the protected activity, Brooks' IDHR charge on October 27, 2017, and began an investigation into him that same day. This is arguably enough to create a genuine issue of material fact as to the causal connection between Brooks IDHR complaint and the investigation into him. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (holding that the fact that plaintiff was terminated the same day she complained created genuine issue of material fact as to causation). As Brooks engaged in protected activity by filing ADA charges with the IDHR/EEOC and his unpaid suspension was an adverse action, he can make out a prima facie case of retaliation.

Brooks cannot, however, show that the reasons given for his suspension were pretextual. Pretext is "more than a mistake on the part of the employer; pretext mans a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If the employer "honestly believed its reasons for taking the challenged actions, even if those

---

[24] Brooks did not include his ADA claims in his March 2018 IDHR/EEOC charge of discrimination. While they were included in his August 2018 IDHR/EEOC charges of discrimination, that was after he had retired and cannot be the causal basis for the alleged adverse actions.

reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 36, 368 (7th Cir. 2022). "Because courts are not super-personnel departments who sit in judgment of management decisions, it is of no moment if the employer's reasoning is incorrect, 'foolish, trivial or even baseless.'" *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022) (quoting *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 879 (7th Cir. 2001)).

Brooks fails to produce evidence that would allow a reasonable jury to find that the City's decision to suspend him pretextual. He fails to meaningfully contest many of the allegations against him. Even viewing the evidence in the light most favorable to Brooks, he was making insubordinate comments to other officers in the department, denigrating the City's administration. While he contends that he never would have retaliated against subordinate officers, he has no evidence showing that those officers and the City did not legitimately fear retaliation from him. The undisputed evidence shows that the officers said as much to Baxter and that Baxter and Dossey believed their concerns were reasonable.

Brooks doesn't fare much better at his challenges to the personnel record allegations. While the precise details of the dispute are contested, Brooks undisputedly had access to at least one record that should have been destroyed years before he prepared his rebuttal to the allegations against him. And while he disputes physically removing any files from the police department, he cannot show that the City did not honestly believe that he was responsible for Melton's missing FTO file and his deposition testimony clearly indicates that he emailed several records to his personal email address in violation of City policies.

Because Brooks argues at most that the City should not have suspended or threatened to terminate him for these offenses, and not that these reasons were a lie to justify their true

48

retaliatory and discriminatory purpose, no reasonable jury could find the City's reasons for terminating him pretextual.[25]

As such, Defendants' motion for summary judgment is granted as to Count III.

### b.  Brooks' and Simmons' Title VII Retaliation Claims

Brooks and Simmons each bring a Title VII Retaliation claim. Each fails to establish an adequate causal link between their protected activity and the discipline/termination and neither can show that their misconduct was not an superseding factor.

### i.  Count IV- Simmons Title VII Retaliation Claim

Simmons Title VII retaliation claim alleges that he was disciplined and terminated because of his December 2016 and April 2017 complaints about Lieutenant Burris's comments about his sexual relationships. These comments are insufficient as a matter of law to violate Title VII, but this does not necessarily defeat Simmons' retaliation claim. An employee may engage in protected activity if he reasonably and sincerely believes that the conduct he complains of violates Title VII. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). Defendants argue that Simmons could not have reasonably believed that Burris's two isolated comments violated Title VII. We do not address this issue because we find that Simmons fails to prove the required causal connection between his complaints and his termination.

Simmons' evidence of causation on this count is the same as discussed in the cat's paw and comparator sections above. As discussed in greater detail there, the Court finds that he has failed to create a genuine issue of fact that Melton, Burris, and Dossey fabricated or aided the fabrication of disciplinary charges against him in retaliation for his complaints against Burris.

---

[25] While we do not address the issue of pretext in detail for Simmons because he fails to establish causation, he also would fail to show that the reasons for his termination were pretextual. He has no evidence that the Dossey and Baxter's didn't honestly believe that Simmons should be terminated because he surreptitiously recorded shift briefings and gave those recordings to parties suing the City.

Ultimately, it feels too implausible to believe that an employee's mere friendship with another who is the target of complaints, creates a genuine issue of fact for retaliation.

Further, Plaintiffs fail to show how Simmons taping and releasing confidential briefings is not a superseding cause that breaks this chain. Plaintiffs repeatedly argue that Simmons was allowed to record anything he wanted in the department because the officers lacked a reasonable expectation of privacy, but utterly fail to explain why that also allowed him to send the recordings of a briefing discussing an excessive force incident to the affected civilian and his lawyers.

As such, Defendants' motion for summary judgment is granted as to Count IV.

### ii.  Count XII- Brooks Title VII Retaliation Claim

Brooks' Title VII Retaliation claim similarly fails. Brooks' Title VII claim was initially based on the City having retaliated against him for both (1) his participation in the Melton investigation and (2) his filing a Title VII retaliation charge with the EEOC. In ruling on the Defendant's motion to dismiss, the Court dismissed the retaliation claim with prejudice to the with regards to his participation in the Melton investigation. Doc. 24 at 11-13. It allowed the claim to proceed to the extent it claimed retaliation for having filed the March 12, 2018, EEOC charge. *Id*. At the pleading stage, it was sufficient for Brooks to allege that his constructive discharge was because of this filing. Now at the summary judgment stage, he must produce sufficient evidence to allow a reasonable jury to find that his March 12 EEOC charge was the cause of his constructive discharge. He has failed to do so, and so summary judgment is appropriate on this claim.

Brooks' argument that a jury could find he was retaliated against for filing his Title VII complaint is twofold: first, the short time period between when he filed his charge, March 12,

and when he was placed on unpaid leave, March 27; second, that none of his alleged comparators engaged in protected activity. As discussed above, none of the comparators is a fit for Brooks.

Brooks only evidence then is the timing, but this is insufficient. Unlike with his ADA claim, Brooks has no evidence that the Defendants had notice that he'd even filed a claim. The causal link is further weakened by the fact that there was already an ongoing investigation into Brooks when he filed his EEOC charge. The only potentially adverse action after the March 12 filing was a switch from paid leave to unpaid leave. Even drawing all reasonable inferences in his favor, this is not enough to create a genuine issue of fact as to whether his discipline was retaliation for his March EEOC charge.

As such, Defendant's motion for summary judgment is granted as to Count XII.

     c.   Counts V, VI, IX, X- Brooks' and Simmons' Age Discrimination Claims

The plaintiffs have failed to create a genuine issue of material fact as to any of their age discrimination claims. ADEA claims are subject to the legal standard set forth in *Ortiz* and the *McDonnell Douglas* burden shifting framework. *Marnocha*, 986 F.3d at 718-19. Age-based discrimination claims under the Fourteenth Amendment are subject to rational basis review. *Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021). This requires showing that "(1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Id.*

The Plaintiffs have failed to produce sufficient evidence to allow a reasonable jury to find that their treatment was motivated by discriminatory animus based on their age. They have no direct evidence of any kind showing age-related animus. They rely solely on the comparator

evidence discussed above which the court finds inapplicable. With respect to Plaintiffs' age discrimination claims, their comparators fail for an additional reason. To state a prima facie case of age discrimination under ADEA, a plaintiff must show that "similarly situated and *substantially younger employees* were treated more favorably." *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1142 (7th Cir. 1998) (emphasis added). To be considered substantially younger, a comparator ordinarily must ordinarily be at least ten years younger than the plaintiffs. *Kariotis v. Navistar Int. Trans. Corp.*, 131 F.3d 672, 676 n. 1 (7th Cir. 1997) (age difference of less than ten years presumed insubstantial); *Fisher*, 139 F.3d at 1141 (same).

Plaintiffs fail to state the ages of the comparators with any meaningful particularity. At the outset, they do not clearly indicate their own ages and state only that they "were two of the oldest officers in the police department." Doc. 186 at 201, Plaintiff's AMF ¶310 (citing Brooks affidavit, 177-13, saying same). Brooks' IDHR/EEOC charges include his full Date of Birth and indicate that he would have been between 54 and 55 at the time of his discipline and retirement. The copies of Simmons' IDHR/EEOC charges provided as exhibits were redacted his exact Date of Birth, but included his year of birth and so he would have been between 51 and 52 at the time of his discipline and retirement.

For Lieutenant Burris, the only evidence of his specific age is the statement that he "was not immediately pensionable as were Simmons and Brooks due to the fact he was not yet age 50." *Id.*, Plaintiff's AMF ¶330. For Officer Gallup, they similarly state only that he was under 50. *Id.* at 209, Plaintiff's AMF ¶361. For the other comparators, Plaintiffs are entirely silent about their ages. *Id.*, Plaintiff's AMF ¶¶336-355. To be able to introduce them as comparators, Plaintiffs must have admissible evidence showing that each was at least as young as 44-45 for Brooks and 41-42 for Simmons at the relevant time. As they fail to do so, Plaintiffs cannot show

that the comparators were substantially younger and therefore cannot rely on them for a prima facie case of age discrimination as required by ADEA claims. *Fisher*, 139 F.3d at 1142. As they have failed to identify any valid comparators and have no direct evidence, they have failed to show that a reasonable jury could find for them on these claims.

As such, Defendants motion for summary judgment is therefore granted as to Counts V, VI, IX, and X.

IV.    Plaintiffs' Remaining Claims

We finally turn to Plaintiffs' non-employment discrimination claims. Simmons alleges that the City's refusal to pay part of his insurance premiums as a retiree under the police union's CBA is a breach of contract and a violation of his due process rights. Brooks brings a state law claim that the City deprived him of sick days he was entitled to in violation of the Illinois Wage Payment Collections Act. Simmons brings a state law claim against Officer Melton, alleging that she fabricated her sexual harassment complaint in order to get him fired. We address each claim in turn.

a.    Counts VIII and XI- Simmons Due Process and Breach of Contract Claims

Counts VIII and XI use different legal theories to articulate the same injury. Simmons claims that he should rightfully be considered a 'retiree' as that term is used in the collective bargaining agreement between the City of Pekin and its police officers, and therefore he is entitled to have half of his post termination/retirement health insurance premiums covered by the City. Count VIII states that this failure is a violation of Simmons' Fourteenth Amendment Due Process right, while Count XI styles it as a state law breach of contract claim. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). A property

interest "can be created by 'contracts with public entities.'" *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) (quoting *O'Gorman v. City of Chicago*, 777 F.3d 885, 890 (7th Cir. 2015)). Simmons' due process claim then depends integrally on whether he qualifies as a retiree under the CBA. The same analysis therefore applies to the due process and contract claims.

Under Illinois law, "[w]here the terms of a contract are clear and unambiguous, they must be given effect as written, and under those circumstances, the meaning of the contract is a question of law." A contract term will only be found to be ambiguous "if the language is reasonably or fairly susceptible to more than one construction." *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1st 1993). If a contract is ambiguous as a matter of law, however, "the meaning of any ambiguity found by the court is a question of fact for the determination of the jury." *Id.*

When a contract does not define a term, "the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the contract as a whole." *Dean Mgmt., Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 939 (Ill. App. Ct. 2nd 2003). "Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties." *Intersport, Inc. v Nat'l Collegiate Athletic Ass'n*, 885 N.E.2d 532, 539 (Ill. App. Ct. 1st. 2008). The "contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered." *Id.* (citing *Merchants Env't Indus., Inc. v. SLT Realty Ltd. P'ship*, 731 N.E.2d 394, 405 (Ill. App. Ct. 1st 2000). Dictionaries may also be used to discern the "plain and ordinary meaning" of terms in a contract. *Fremont Cas. Ins. Co. v. Ace-Chicago Great Dane Corp.*, 739 N.E.2d 85, 91 (Ill. App. Ct. 1st 2000). These principles are all ultimately aids to the primary objective in construing a contract,

which "is to give effect to the intent of the parties." *Gallagher v. Lenart*, 875 N.E.2d 43, 58 (Ill. 2007).

Defendants argue that the contract term "retiree" is unambiguous and does not include employees like Simmons who are terminated for cause. Plaintiffs disagree and claim that "retiree" is ambiguous, creating a genuine issue of disputed material fact that precludes summary judgment. We address the different bases that the parties use to support their interpretations one-by-one.

The Court has twice previously found that Plaintiff's failed to adequately allege that Simmons qualified as a retiree under the CBA. *See* Doc. 24, 29. Plaintiff had previously argued that Simmons was receiving pension benefits and was therefore entitled to retiree status. Doc. 20, 25. The Court was unpersuaded by this argument and Plaintiffs have abandoned it at summary judgment. Now on summary judgment, Plaintiffs' sole evidence that the contract language is ambiguous is two sets of dictionary definitions. They rely principally on thelawdictionary.org, a free legal resource that purports to have the definitions from the second edition of Black's Law Dictionary.[26] The site defines a retiree as someone who has retired from working; retired means "the act of being in retirement from working and with no plans to return to work"; and, finally, reaching the bottom, retirement means "[f]orced or voluntary withdrawal from the job market." Alternatively, they claim that the most recent edition of Black's Law Dictionary defines retirement as "Termination of one's own employment or career, esp[ecially] upon reaching a certain age or for health reasons; the action or fact of stopping work at a job, usu[ally] upon reaching the normal age for leaving employment. Retirement may be voluntary or involuntary."

---

[26] When the Court checked independent copies of the Black's Law Dictionary, 2nd edition, it did not have the definitions listed at thelawdictionary.org. It's only definition for retire was related to bills of exchange, and it did not contain definitions for retiree, retired, or retirement. Black's Law Dictionary (2nd ed. 1910).

*Retirement*, Black's Law Dictionary (11th ed. 2019). These dictionary definitions do not squarely address the issue in this case. The most common definitions of involuntary retirement, in fact the one in Black's Law Dictionary's list of definitions for retirement that Plaintiff conspicuously omits, is a mandatory retirement based on reaching a set maximum age.[27] The dictionary definitions relied upon by Plaintiffs are at best tepidly consistent with their argument and are not strong evidence that the contract term retiree is ambiguous as to Simmons.

To interpret the meaning of retiree under the CBA, Defendants ask the Court to consider the City of Pekin Employee Handbook, which they claim explicitly says terminated employees are not retirees. Plaintiffs argue in response that the Handbook is irrelevant to interpreting the CBA because it has a disclaimer that employees covered by CBAs should refer to their specific contracts where appropriate as "[c]ontract language shall take precedence over statements found in the Manual." Doc 172-77, p. 15. Defendants' claim that the Handbook explicitly excludes terminated employees as retirees is an overstatement, at the least. Like the CBA, the Handbook does not explicitly define retiree, retire, or retirement. The portion of the Handbook that Defendants cite to in their statement of Undisputed Material Facts says merely that "if an employee resigns or is terminated prior to retirement, the employee will only have the rights, if any, provided by federal and state law." Doc. 127-77 at p.16. This statement is merely consistent with Defendant's argument that termination for cause precludes retiree status; it is not the definitive proof that they make it out to be. Plaintiffs' argument similarly overstates the relevance of the quoted section in the Handbook. This is not a case where the Handbook has one clear definition that conflicts with a clear definition in the CBA. The Handbook is relevant, if at all, because there is not a direct definition in the CBA as to who is or is not a retiree. As an additional

---

[27] *Retirement – compulsory retirement*, Black's Law Dictionary (11th ed. 2019).

(non-contractual) agreement between Pekin and its employees, the Handbook gives us some marginal insight into what they meant by the word retiree.

This Court previously agreed with Defendants that the plain and ordinary meaning of retiree is someone who voluntarily leaves the job market, and not someone terminated for cause. Defendants note that Brooks stated in his deposition that he retired because he believed that if he was fired, he would not be entitled to retiree insurance coverage. Finally, Defendants point out that Simmons is still trying to get his job back through arbitration and therefore has not retired.

While the parties do not address the usage of retire/retiree/retirement elsewhere in the contract, we are free to do so. The CBA uses retiree, retirement, or retire in 13 places. The first occurs in Section 19.- Termination of Seniority, which says that an employee's seniority shall cease when he: "a) quits by accepted written resignation; retires; is discharged for just cause; is laid off…." Doc. 172-78 at p. 22. In Section 29.2 Vacation Payoff Upon Termination, the CBA states that when "an officer's employment is terminated, he resigns, or he retires, he will receive pay for any vacation he became eligible for in the year of his termination, resignation or retirement that has not been taken." *Id.* at p. 29. The next sentence against lists termination, resignation, or retirement as three distinct alternatives. In Section 32.4 Unused Sick leave, the CBA provides that no "payment for any unused sick leave shall be made upon termination of employment for any purpose other than retirement with pension benefits." *Id.* at p. 31. The portions of the CBA repeatedly list termination as distinct from retirement, or specify termination for any cause other than retirement. This repeated usage throughout the CBA strongly indicates that the parties did not intend to include officers terminated for cause in the category of retirees.

Based on the totality of the evidence introduced by the parties, the Court finds that Plaintiffs fail to establish that the use of 'retiree' in the CBA is ambiguous. The plain meaning of the term does not include someone who is terminated for cause like Simmons.

Accordingly, Defendant's are entitled to summary judgment on Counts VIII and XI.

### A.  Due Process and Breaches of Contract

The Court grants summary judgment on Simmons due process claim for an additional reason that the parties did not address in their briefing. "To state a claim for a procedural due process violation, a plaintiff must demonstrate (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Manistee Apts., LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). A contract with a public entity can created a property interest protected by the due process clause, but that does not mean that the remedies for a due process clause violation are the same as those for the underlying contract.

The due process clause guarantees Simmons, if anything, a hearing on whether he is entitled to retirement benefits under the contract. But the due process clause does not "require hearings to resolve disputes about the meaning and effect of laws, regulations, and contracts." *Goros v. Cnty. Of Cook*, 489 F.3d 857, 859-60 (7th Cir. 2007). The "adequacy of litigation as a means to determine the meaning of a contract is a premise of our legal system." *Chi. United Indus., Ltd. V. City of Chi.*, 445 F.3d 940, 944 (7th Cir. 2006). The Seventh Circuit has long held that unless "the plaintiff maintains that the state actor had to offer a hearing to resolve some contested issue of fact, the dispute belongs in state court under state law." *Khan v. Bland*, 60 F.3d 519, 532-33 (7th Cir. 2010); *see also Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). The relief Simmons requests under his due process claim is for this court to vindicate substantive rights under the CBA - payment of compensatory damages, recovery for

emotional distress, and injunctive relief in the form of an order that the City of Pekin continue paying him retirement benefits. This relief is unavailable under a procedural due process claim as a matter of law. For this additional reason, we grant Defendants motion for summary judgment as to Count VIII.

> b.  <u>Count XIII- Brooks Illinois Wage Payment and Collections Act Claim</u>

In Count XIII, Brooks alleges that he was not paid for sick leave he was entitled to in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.* To state a claim under the IWPCA, an employee is "required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021). The IWPCA "provides no substantive relief beyond what the underlying employment contract [or agreement] requires." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016).

Both parties agree that the relevant agreement is the City of Pekin Employee Handbook. Doc. 172-77, Def. Ex. 77. The Handbook states that "employees who retire or whose employment otherwise terminates will be paid for all earned but unused vacation in accordance with Illinois law." *Id.* at p. 15. Upon "retirement, up to a maximum of 240 sick days (1,920 hours) can be used to pay for City of Pekin group health insurance premiums and/or to extend IMRF service credit." *Id.* Both parties agree that upon Brooks retirement, the City placed roughly $60,000 dollars into an account to pay for his health insurance premiums. The only disagreement is whether this amount includes the entirety of the sick leave Brooks was entitled to.

Brooks' argument works as follows. On March 27, 2018, Chief Dossey unilaterally placed Brooks on unpaid leave for over five days.  Brooks argues that this unpaid leave violated

65 ILCS 5/10-2.1-17 and Rule 8.2 of the Fire and Police Commission. During this unpaid leave, Brooks claims that the City did not allow him to accrue sick leave and so, if not for his allegedly unlawful unpaid leave, he would have had additional sick leave when he retired in July 2018. Brooks argues therefore the payment did not include any sick leave he should have received for the period starting in March when he was placed on unpaid leave and ending in July when he retired.

Defendants argue that Brooks unpaid leave status was lawful and therefore he was not entitled to any further sick leave. Defendants note that Chief Dossey placed Brooks on unpaid leave status on March 27, 2018. Doc. 172-74. The Commission voted to approve Brooks unpaid leave status pending his disciplinary hearing the very next day on March 28, 2018. Doc. 177-151, Plaintiff's Ex. 150. Therefore, Defendant argues, Brooks suspension was entirely lawful, and he is not entitled to any additional sick pay and so has no claim under the IWPCA.

Based on these facts, Defendants have shown that there is no genuine issue of material fact, and they are entitled to judgment as a matter of law on Brooks IWPCA claim. Under Rule 8.2 of the City of Pekin Fire and Police Commission Rules and Regulations, the Chief of Police "shall have the right to suspend any officer under their command for a period not to exceed 5 days providing no charges on the same offense have been filed and are pending before the commission and they shall notify the commission in a timely manner of the time of the suspension." Doc. 177-76, Plaintiff's Ex. 74. Similarly, 65 ILCS 5/10-2.1-17 prohibits the Chief of Police from suspending an officer without pay for more than 5 days unless the Chief informs the Commission in writing and the Commission arranges for a hearing on the charges underlying the suspension. Defendant's unrebutted evidence shows that within one day of Brooks' suspension by Chief Dossey, the Commission met and approved his suspension pending a

60

disciplinary hearing. This satisfies both the Commission's Rule 8.2 and the Act's statutory requirements. Plaintiff has failed to produce specific evidence contradicting this and therefore failed to prove the existence of a genuine issue of material fact.

The Court additionally notes that Brooks has failed to show that he was entitled to more sick leave than he was paid, even if his suspension was unlawful. In the Undisputed Material Facts section of their Motion for Summary Judgment, Defendants state that Brooks received all sick pay he was entitled to. Doc. 172 at 48, UMF ¶303. Defendants base this on the deposition testimony of Defendant Sarah Newcomb, Pekin's Human Resources Director. Doc. 172-32 at p. 71-75. Newcomb testified that a full-time employee such as Brooks is eligible to receive 96 hours of sick time per calendar year. *Id.* at 73. On January 1, 2018, Brooks was given the entire 96 hours he would have been entitled to if he had worked the entire year. *Id.* at 71, 73. Although Plaintiffs identify this fact as a disputed and material, they point to no specific evidence showing that Brooks was paid any amount other than the full year's worth, or 96 hours, as testified to by Newcomb. It is therefore immaterial whether Brooks was entitled to sick leave for the period of March-July 2018, because the uncontradicted evidence shows that he was paid for all that time and more.

The Court finds that the Defendants have shown that there is no genuine issue of material fact as to Brooks' IWPCA claim and they are entitled to judgment as a matter of law. Therefore, their motion for summary judgment is granted as to Count XIII.

    a.   <u>Count VII- Simmons Intentional Interference With Employment Relations Against Officer Melton</u>

We now turn to the final issue, Simmons' state law Intentional Interference With Employment Relations claim against Officer Melton. Plaintiffs have established a genuine issue

of material fact as to Simmons intentional interference with employment relationship against

Officer Melton. Under Illinois law, a plaintiff can establish the tort of intentional interference

with employment relationship by proving that plaintiff had "(1) [a] reasonable expectation of

continued employment; (2) knowledge of the business relationship by the interferer; (3)

intentional interference; and (4) resultant damage." *Marczak v. Drexel Nat. Bank*, 186 Ill.App.3d

640, 645 (Ill. App. 1st 1989). Not all interference is actionable, there must be "some impropriety

in doing so." *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk and Western Ry. Co.*, 195 Ill.2d

356, 369-70 (2001). Illinois courts have held that there is no impropriety in making truthful

statements, but it is generally improper interference when someone makes knowingly and

maliciously false statements. *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. App.

1st 1995) (truthful statements cannot be basis for interference with contractual relationship);

*Marczak*, 186 Ill. App. 3d at 646-47 (false and malicious allegations that resulted in plaintiff's

loss of employment were sufficient to state claim for interference with contractual relationship).

As such, Plaintiff can prevail only if he can show that Officer Melton knew her claims of sexual

harassment were false when she made them.

Simmons argues that Officer Melton falsely accused him of commenting on her breasts

on two dates in March 2017. He denies ever making the statements in question and argues that

her knowingly false accusation caused him to be placed on unpaid leave and eventually

terminated. In rebuttal, Defendants argue that Melton heard him make the statements and they

were corroborated by several witnesses. As to the incident on March 3, 2017, Melton's husband,

Charles Melton, testified that he observed Simmons comment and use hand gestures to describe

the size of Officer Melton's breasts. As to the incident on March 25, 2017, it was witnessed by

Doug Vogel. For both accounts, Deputy Chief Baxter investigated and found Officer Melton's

account credible, as did HR Director Newcomb, and the Pekin Police and Fire Commission. Defendants also raise very real concerns that allowing Simmons' claim to go to trial will have a chilling effect on reporting of harassment, as it would allow anyone accused of sexual harassment to threaten their accusers with legal action so long as the accused denies engaging in the underlying misconduct.

While Defendants' version of events is far more corroborated than Plaintiffs' and their chilling effect concerns are legitimate, this issue will ultimately be decided upon determinations of credibility that we cannot make on summary judgment. Drawing all reasonable inferences in Simmons' favor as we must, a reasonable jury could believe his denial of the statements attributed to him over Officer Melton and the corroborating witnesses.

As such, Defendants' motion for summary judgment is denied as to Count VII. However, the Court has dismissed or granted summary judgment on each claim over which it has original jurisdiction. The Court declines to maintain supplemental jurisdiction over the remaining state law claim against Officer Melton and so *sua sponte* dismisses Count VII without prejudice. *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999) (stating "we pause to emphasize that it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *see also* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— (3) the district court has dismissed all claims over which it has original jurisdiction.").

## Conclusion

For the reasons set forth above, Defendants' Motion (Doc. 172) for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is DENIED as to Count VII

and GRANTED as to all other Counts in Plaintiffs Second (Doc. 37) Amended Complaint. As

the Court has disposed of all claims over which it has original jurisdiction, it declines to maintain

jurisdiction over the remaining state law claim and so DISMISSES Count VII without prejudice.

The Clerk is directed to terminate this case.

    Signed on this 10th day of May, 2023,

s/ James E Shadid_____<br>
James E. Shadid<br>
United States District Judge